**ROSS et al. v. UNITED STATES.**

No. 10897.

United States Court of Appeals
Sixth Circuit.
Feb. 14, 1950.

162

Robert N. Gorman, Cincinnati, Ohio, Joseph Keenan, Washington, D. C., Harry A. Abrams, Cincinnati, Ohio, on the brief, for appellants.

Frank J. Richter, Cincinnati, Ohio, Ray J. O'Donnell, Cincinnati, Ohio, on the brief, for appellee.

Before HICKS, Chief Judge, MARTIN and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

The three appellants were convicted by a jury on several counts of a joint indictment charging violation of section 1731(a) of Title 12,[1] United States Code, and also upon a count drawn under section 88 of Title 18,[2] United States Code, charging conspiracy to violate section 1731(a) of Title 12. Each defendant was fined $12,500 and sentenced to an aggregate four years in prison. The sentences imposed were within the limits of the statutes.

Section 1731(a) of Title 12, United States Code, provides: "Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Federal Housing Administration for insurance, or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by the said Administration, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of said Administration under this chapter makes, passes, utters, or publishes, or causes to be made, passed, uttered, or published any statement, knowing the same to be false, or alters, forges, or counterfeits, or causes or procures to be altered, forged, or counterfeited, any instrument, paper, or document, or utters, publishes, or passes as true, or causes to be uttered, published, or passed as true, any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall

---

1. 1948 Revised Criminal Code, 18 U.S.C.A. § 1010.

2. 1948 Revised Criminal Code, 18 U.S.C.A. § 371.

be punished by a fine of not more than $3,000 or by imprisonment for not more than two years, or both."

■ We shall not indulge in any extensive factual narrative. The government adduced abundant substantial evidence to support the verdict of the jury on all counts upon which the respective defendants were found guilty. Each of the three defendants testified in his own behalf in contradiction of material adverse testimony. A general description of the method of business operation employed by them would seem to suffice.

Irving Ross, who for several years had been active, first in canvassing prospects and later in making sales, for suppliers of siding for residential houses, went to Portsmouth, Ohio, in April, 1946, and joined in a partnership enterprise with Phil Cohen in the selling of imitation brick siding for residences. Phil Cohen at times used the alias "Phillips" and is the same person whose conviction at Dayton, Ohio, for violation of the same statute here involved, was affirmed by this court on November 30, 1949. See Phil S. Cohen, alias P. H. Phillips, and Leo Escovitch, alias Leo Esco, v. United States of America, 6 Cir., 178 F.2d 588, 591. The partnership in Portsmouth was dissolved when Cohen left for Dayton, Ohio. According to Irving Ross, the manager of the Universal C. I. T. Corporation at Portsmouth told him: "If you sever your connection with Cohen, we'll continue to take your paper."

Shortly after Cohen left Portsmouth, appellants Martin Ross and Milton Gecker showed up there and entered into the siding business with Irving Ross, the three men calling themselves the "Portsmouth Construction Company". Both Martin Ross and Milton Gecker had previously been canvassers and salesmen in the siding business elsewhere. Martin was the brother of Irving Ross.

Appellants made arrangements with the Portsmouth branch manager of the C. I. T. Corporation to finance their business by acquiring at discount their customers' notes, endorsed by Portsmouth Construction Company "without recourse". Appellants secured and used printed forms of "FHA Title I Credit Application" blanks, addressed to Universal C. I. T. Credit Corporation, printed forms of "FHA Title I Borrower's Completion Certificate", and also printed forms of promissory notes "negotiable and payable at the office of Universal C. I. T. Credit Corporation, New York, Chicago, or San Francisco, with exchange."

Armed with these documents, appellants proceeded to consummate their scheme, which from the testimony of government witnesses was obviously fraudulent. One or two of them would approach a poor and ignorant person and induce him to permit appellants to place siding on his modest home by representing that the Portsmouth Construction Company desired to advertise by placing its siding on model homes; and that the siding would cost the customer nothing, inasmuch as he would receive $25 commission for every job which was sold by appellants in consequence of people seeing the favored customer's home with the appellants' siding on it. For example, William Delebar and the McManaways were told that appellants desired to use their homes for demonstration purposes over a period of three years.

Each person approached was told that he must keep secret the fact that he had made the arrangements which would give him the siding free of cost. The government's proof showed that by various misrepresentations, such as the statement that signed forms were needed to keep required records, the appellants induced persons who agreed to have siding put on their homes to sign blank FHA Title I Credit Applications, and blank promissory notes. Subsequently, the application forms were filled in with false information making the homeowner's financial status appear much more favorable than it actually was. The blank notes were filled in with amounts payable, varying from thirty-seven to seventy per cent of the purchase price of the respective homes.

After the Universal C. I. T. Credit Corporation had received the credit information on the FHA application form and had checked it with the local Merchants Credit Bureau, it would discount the note and

then assign it to the Commercial Investment Trust, Inc., of New York, which had a contract of insurance for property improvement loans with the Federal Housing Administration. All notes for property improvement, including those involved here, which were discounted by the Portsmouth branch of the Universal C. I. T. Credit Corporation were insured by the Federal Housing Administration.

In late October or early November, 1946, when C. I. T. began to call upon the favored customers to pay the first maturing instalments of their promissory notes, appellants, though they had avowed intended long sojourn in the attractive city of Portsmouth—but lived in hotels—found the city no longer attractive, and left.

■ Appellants contend that the indictment does not sufficiently state an offense against the laws of the United States. The same contention was rejected in Cohen v. United States, supra, in which the indictment was for violation of the same statute involved in the substantive counts in this case: namely, section 1731 (a), Title 12, U.S.C. Judge Allen said: "The indictment was drawn in the language of the statute, and each count supplies the specific information applicable to the particular transaction described therein. This is in general sufficient. Rule 7(c), Federal Rules of Criminal Procedure, 18 U.S.C.A.; Sutton v. United States, 5 Cir., 157 F.2d 661; Mellor v. United States, 8 Cir., 160 F. 2d 757; Robertson v. United States, 5 Cir., 168 F.2d 294. * * *" The various offenses were fully and clearly charged since the counts of the indictment specified the time and place of each transaction, and the uttering and publishing, in each case, of a false credit application and note, particularly described, in violation of the statute." In Pierce v. United States, 6 Cir., 86 F.2d 949, 951, this court quoted from its earlier opinion in Bettman v. United States, 6 Cir., 224 F. 819, 826, as follows: "The certainty required in an indictment is only such as will fairly inform the defendant of the crime intended to be alleged, so as to enable him to prepare for defense and so as to make the judgment a complete defense to a second prosecution for the same offense."

As to the substantive offenses charged, the indictment in the instant case meets this required standard. So, also, does the conspiracy count, which, in pleading the twelfth overt act, charges that the false and fraudulent statements were uttered, published and passed to the Universal C. I. T. Credit Corporation. We find no merit in the argument that counts two and eleven were duplicitous. See Cohen v. United States, supra; Troutman v. United States, 10 Cir., 100 F.2d 628.

■ The further contention is made by appellants that they merely assisted borrowers in procuring loans, and that section 1731(a) has application only to borrowers. But the statute is not susceptible to this narrow interpretation, for it applies in express language in the alternative to anyone who "for the purpose of influencing in any way the action" of the Federal Housing Administration under the Act is guilty of the actions condemned, and provides punishment therefor.

The appellants' argument has been rejected by the Court of Appeals for the Fifth Circuit in Hartwell v. United States, 107 F.2d 359, 361, where Judge Hutcheson said with respect to the statute: "But, we think it plain, that the act must be considered as a whole and in the light of the purposes and objectives it was designed to achieve, and that so considered to place upon it, a construction which would limit its scope to borrowers alone, is an unreasonable narrowing of its scope and effect." In the Cohen case, our court pointed out that the essence of the crime is the uttering and publishing of false documents with intent to influence the Federal Housing Administration. Cf. Reass v. United States, 4 Cir., 99 F.2d 752.

■ The insistence of appellants that they should have had a verdict directed in their favor is not well grounded. They urge that there was no proof that the applications were made with the intent that the loans should be offered to the Federal Housing Administration. As in the Cohen case, appellants furnished the signers of the documents FHA forms upon which was prominently displayed, on the top line: "F

HA Title I Credit Application". As stated in the opinion in that case, the jury was privileged to infer existence of intent that loans should be sought from the Federal Housing Administration, and that the particular applications and notes were used to influence the action of that governmental agency. This being true, there was no error in the refusal of the district judge to charge, as requested by appellants, that in order to convict it must be found that appellants had "actual knowledge that said credit application would be offered by the Universal C. I. T. Credit Corporation to or accepted by the Federal Housing Administration for insurance and that the action of said Federal Housing Administration would be influenced thereby"; or that if the jury should find that "the Federal Housing Administration was not influenced in granting said loans by said credit applications, but relied upon and were influenced by the C. I. T. Credit Corporation approval", the appellants should be found not guilty.

■■ Complaint is made that the court permitted introduction of prejudicial evidence not properly receivable. After careful consideration, we find no reversible error in the rulings of the trial court on the admission of evidence. Some of it received may, strictly speaking, have been irrelevant, but this is not unusual in the trial of a case which consumed the time and required the detail which this one did. In our judgment, no incompetent evidence of a prejudicial sort was permitted to be put before the jury. We think, however, that the government's exhibit number seven, showing that losses on some of the defaulted notes involved were paid by the United States under its obligation as insurer, should have been excluded as being too remote. The gist of the offense with which appellants were charged is the uttering and publishing of false statements with intent to influence the Federal Housing Administration in the insurance of loans.

■ We think the trial court erred in failing to follow the express mandate of Rule 30 of the Rules of Criminal Procedure, 18 U.S.C.A. At the conclusion of the evidence, attorneys for the defendants season-ably tendered numerous requested special instructions to the jury. The district judge stated that he would not grant any of the special requests, as such, but would try to give them in his general charge; that the instructions were correct except "in a couple of instances"; and that he would "cover the correct law governing the case" in his general charge, upon the conclusion of which he would ask if there were any omissions and have them pointed out. The attorney for appellants noted exception under the Rules of Criminal Procedure, stating that counsel were entitled to know the ruling of the court on each of the requests before the argument to the jury. In this, he was correct. Rule 30 of the Rules of Criminal Procedure (which is similar to Civil Procedure Rule 51, 28 U.S.C.A.) provides: "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. *The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury,* but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury." [Italics supplied.] The notes to the rules, as prepared under the direction of the Advisory Committee, state that it seemed appropriate that on a point such as instructions to juries there should be no difference in procedure between civil and criminal cases. The obvious object of the rule in point is to require the judge to inform the trial lawyers in a fair way what the charge is going to be, so that they may intelligently argue the case to the jury.

■ We have already stated that two of the special requests which the court did not give were incorrect in law, but the trial judge did not identify these incorrect

requested instructions before the case was argued to the jury. Indeed, as to one, he indicated that the substance of it would be given. The deleterious effect of the failure of the judge to follow the rule is emphasized by the fact that, although he intended to do so, he actually failed to charge all the correct general propositions requested in writing by appellants. It is not implied that the court must give *in haec verba* the language of a special request which he indicates will be given; but he should at least charge the full substance of it.

Appellants contend that the trial court failed properly to correct its obvious error in charging the jury, as follows: "You the jury, will therefore investigate, weigh and piece together *all of the evidence brought before you here on behalf of the government* and submitted to you for your consideration, and from this evidence, you will determine whether or not the defendants or any of them did thus enter into an unlawful conspiracy." [Italics supplied.] The error was accentuated by the subsequent instruction: "You should consider whether *any of those testifying on behalf of the United States* are actuated by any motive other than to tell the truth, are actuated by any other motive than to see that the law is upheld, and generally, you should consider all of the circumstances surrounding the testimony of the witnesses and determine the credibility of each and every witness fairly and impartially and when you reach a conclusion as to what credit should be given to witnesses, then give that credit." [Italics supplied.]

The court should have charged the jurors that they must consider *all* the evidence in the case in determining the guilt or innocence of the accused, and should not have limited the last quoted instruction to the government's witnesses. After exception had been duly taken, the court stated: "All right. We will accept the correction that the jury will consider all of the evidence"; and added, later: "The jury heard the suggestion by Judge Gorman. The court will accept that suggestion."

Appellants insist that it was not adequate instruction merely to say that the brief statements of the attorney for the defendants in taking exceptions were accepted, but that it was "the duty of the court to correct its own error." We think the contention is well grounded. After having committed the original fundamental error, the court should not have dealt so lightly with the subject matter. We think that, it being the duty of the court to charge the jury correctly, restatement of the proposition in clear, explicit, and correct language was demanded, so that no confusion could possibly be left in the minds of the jurors that they should consider not only the testimony of the government's witnesses, but also that of the defendants and the witnesses whom they put upon the stand.

Appellants argue with vigor that, not only the conduct of the district attorney, but also that of the judge demanded the granting of their several motions for a mistrial. It is asserted that the judge indicated to the jury his feeling that the defendants were guilty. After carefully considering the several incidents pointed out, we are of opinion that reversible error was not committed by the judge in his comments and attitude during the trial. We think it well, however, to observe that a trial judge should constantly bear in mind the wise and practical words of Chief Justice Fuller that "the influence of the trial judge on the jury is necessary and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841. In a jury trial, the judge should be most guarded in his comments so as to avoid any possible appearance of holding a personal opinion concerning the facts in issue.

We find impelling reversible error in the conduct of the United States Attorney, which deprived the defendants of the constitutional right to a fair trial. Passing without discussion his spontaneous negative exclamation when a witness, Miss Tuttle, mistakenly identified Martin Ross as Irving Ross, the man who, accompanied by Gecker, came to see her; and omitting mention of several trial episodes wherein the zeal

of the district attorney carried him beyond the limits inhibited in Pierce v. United States, 6 Cir., 86 F.2d 949, 952, et seq., we detail only the circumstances of his prejudicial and inflammatory argument to the jury.

At the outset of his closing argument, the appellants were typified as "con men", although there was no evidence of previous illegal activities. Appellants were characterized as "fly-by-nighters, who never stayed long enough in any town to get caught up with", who had plied their trade in Milwaukee, in Detroit, in Tulsa, Oklahoma, in Atlanta, Georgia, and had been "in Chattanooga, Tennessee, trying to ply their trade"—the judge interrupted to correct: "Charlotte, North Carolina." There was no evidence that appellants had been guilty of any illegal activities in any of these cities. The testimony was merely that they had been in the siding business in the places mentioned.

Commenting on the effort of the defense to show that a prosecuting witness, Smith, lied concerning his age in order to enter the Army of the United States, the district attorney exclaimed: "Would you, ladies and gentlemen of the Jury, that we had more liars of that type! That's one place where we find that these three men did not lie. They stayed out of the Army [objection by defendant's attorney] as long as they could." The defense attorney interjected: "That's highly prejudicial, and Mr. O'Donnell knows it." Mr. O'Donnell rejoined, "O. K. That's not a fact." The defense attorney moved for a mistrial, but the court made no comment or ruling.

Later in his argument, the United States Attorney declared: "Now, ladies and gentlemen we are here not because these people have been defrauded, it's because the government of the United States has been defrauded. We the people of the United States, the taxpayers, you and I and Gorman, we have been defrauded by the actions of these men. That's why we are here trying this case." Judge Gorman, defense attorney, objected to the argument, saying, "that isn't the charge in the first place." The Court stated: "The charge is that these men made, published and uttered a false document for the purpose of securing insurance from the Federal Housing Administration which is a subsidiary of the United States Government."

In order to understand clearly the most prejudicial part of the United States Attorney's argument, we must revert briefly to the evidence concerning the change of names of the appellants from "Rosenfeld" to "Ross." Irving Ross had testified on cross-examination that his father's name was "Rosenfelt" and that, in 1946 *before* he engaged in business in Portsmouth, he had, by court procedure in Milwaukee, legally changed his name to "Ross" because he wanted to adopt an easy name to remember. On cross-examination, Martin Ross admitted that his original name had been "Max Rosenfeld", which he legally changed to "Martin Ross" in Cleveland, Ohio, *after* he had left Portsmouth. He testified that, in Portsmouth, he used the name of "Martin Ross", because his brother Irving had changed his name to Ross and he then anticipated changing his own.

On his cross-examination of Martin Ross, the district attorney pressed the point that Martin first testified that his brother's name was "Irving Rosenfeld", while it was shown as "Isador Rosenfeld" in the probate court records at Milwaukee. The witness explained that his brother's middle name was "Isador", but that he had known him as "Irving" as long as he could remember. A reading of the record convinces us that the cross-examination by the district attorney concerning this was unfair when, in a rhetorical question, he charged the witness with perjury.

On re-direct examination, Martin Ross was asked how long he had used that name. He answered, "for about 5 or 6 years." Asked how he happened to use it, he responded that, in Detroit, he was using his name, "Max Rosenfeld", when a prospective customer told him that he "didn't want to do business with a Jew."

The United States Attorney used the incident of the changed names to hit below

168

the belt. No semblance of fair play may be found in the portion of his argument which we now quote: "I am not a Latin scholar, but there is a Latin phrase that says 'Falsus in uno, falsus in omnibus', Martin Ross lied on the witness stand, deliberately, purposely lied on the witness stand and committed perjury, and he told you that he had. He said his brother's name before he changed it was Irving. And he was going to stick to that until I confronted him with the fact that his brother's name was Isadore. I said, who is Isadore? Well, that was a sad moment in Martin's life when he had to say, there is Isadore over there. How much longer?"

The Court: "You have 10 minutes to go."

The District Attorney: "Ladies and gentlemen, this racial phase that has entered into this case, I deplore. I am sorry that it did. We are here under our oaths, we are bound to mete out justice, regardless of the race, color or creed of any party. That these boys are Jews, certainly in my opinion, and certainly not in the opinion of any other person is any reflection upon them. Why are they ashamed of what they are? Why, something was mentioned about Hitler calling Mr. Roosevelt, Rosenfeld. Well, I believe it was Hitler that changed his name from Schickelgruber. Yes, Hitler was ashamed of his name. Why ladies and gentlemen, these young men are traitors to their race."

To condemn as traitors to their race American citizens of Jewish origin who have changed their names is a superlative appeal to prejudice. The purpose and effect of the closing argument of the United States Attorney just quoted "could only have been to arouse passion and prejudice." See opinion of Chief Justice Stone in Viereck v. United States, 318 U.S. 236, 247, 63 S.Ct. 561, 566, 87 L.Ed. 734.

[18] The oft-quoted language of Mr. Justice Sutherland in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, is so impressive and so pertinently applicable here that we conclude this opinion by repeating it: "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones."

The judgment as to each appellant is reversed and the case is remanded to the district court for a new trial.