**Betty Jane CHAPMAN, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 19660.**

United States Court of Appeals
Ninth Circuit.

May 24, 1965.

Rehearing Denied June 29, 1965.

Richard J. Cantrell, Levy, DeRoy, Geffner, Koszdin & Glow, Long Beach, Cal., for appellant.

Manuel L. Real, U. S. Atty., John K. Van de Kamp, Asst. U. S. Atty., Chief, Crim. Sec., J. Brin Schulman, Asst. U. S. Atty., Asst. Chief, Crim. Sec., Bert S. Pines, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and KOELSCH, Circuit Judges, and POWELL, District Judge.

BARNES, Circuit Judge.

Appellant was indicted and convicted by a jury of violating 18 U.S.C. § 2113(c). Section 2113(c) of Title 18, United States Code, reads, insofar as the indictment here involved is concerned, as follows:

> "Whoever receives, possesses, conceals, * * * any property * * * or other thing of value knowing the same to have been taken from a bank, * * * in violation of subsection (b) of this section shall be subject to * * * punishment * * *."

Section 2113(b), Title 18, United States Code, reads in pertinent part:

> "Whoever takes and carries away, with intent to steal or purloin, any property * * * or any other thing of value exceeding $100 belonging to, or in the care, custody, control, management, or possession

of any bank, * * * shall be [punished] * * *."

The indictment charged that appellant "received, possessed and concealed" certain personal property, "stolen from the People's Bank * * * knowing the same to have been stolen." The "property" was alleged to be of "a value of more than $100.00."

The "property" involved was all found by police in appellant's residence on August 21, 1963. Appellant, a former escrow clerk (or "escrow officer") of the bank, had voluntarily terminated her employment at the bank March 21, 1963, some five months prior to the discovery by the police of the "property," but had "balked" at returning the key permitting entrance to the bank premises. (Exs. A and B.) Twice prior to Friday, August 16, 1963, various escrow papers or files had disappeared from the bank. Thinking that they might have been mislaid or misfiled, bank officials took no action. Over the weekend of August 16th to August 19th, 1963, several other papers disappeared, including reference or form books or specimen forms belonging to the new escrow clerk, Miss Bernice Hall, and left by her on the bank premises (Exs. 2, 3, 4, 5 and 6), lists of indexes of escrows (Gov. Exs. 1 and 7) which indexes were owned by the bank, and actual escrow files themselves (Exs. 8–12 and 14–19) containing original and copies of notes, receipts, instructions, ledger sheets, Corporation Commission orders and permits, etc.

When this large volume of documents disappeared, the bank called in law enforcement agencies, and F.B.I. Investigator Gibler and Sergeant Lance of the Los Angeles Police Department assumed supervision of the investigation. As a former employee, appellant became subject to suspicion, and the two officers on August 21, 1963 went to the appellant's home shortly after noon.

After the officers rang the doorbell and waited fifteen minutes, the bell was answered by a young lady who announced that Mrs. Chapman was out shopping. (She identified herself as "just a neighbor.") Noting an automobile in the driveway, the officers asked the young lady who owned the auto. She first said it was hers, and later said it was Mrs. Chapman's. The officers asked if they could await Mrs. Chapman's return in the house, and permission was refused. (It was later ascertained this "neighbor" was appellant's daughter.)

The officers then left, and Investigator Gibler took up a point of observation where he could watch anyone entering or leaving the house, while Sergeant Lance left to check on the ownership of the auto. Lance returned with a third man, Officer Jones, in about thirty minutes. During this time, Gibler had seen no one enter or leave the house. The officers again rang the doorbell and the appellant answered. The officers identified themselves, stated they were investigating the loss or theft of papers from the People's Bank, and asked to enter and talk to her. She consented, and the four persons entered the living room.

While Officer Gibler was outside watching the house, he had noticed smoke and heat waves coming out of the chimney located in appellant's residence. Because the date was August and the place Southern California, his curiosity had been aroused. Immediately upon entry to the living room, he looked at its fireplace, and saw "a large pile of charred paper." He asked appellant if she had been burning something, and she said she had. He asked her what. She replied some old newspapers. Gibler took two or three steps to the fireplace and told appellant the shape of the ashes did not look like newspapers had been burned. The appellant offered no explanation. Gibler then told appellant why the officers were there, that she need make no statement, and that she was entitled to an attorney.

The entire floor of the living room was covered with papers, "piled and strewed over the entire floor." Mrs. Chapman explained she was cleaning the house. From their standing position the officers

could see at least some of the papers on the floor were from the People's Bank, and from its escrow department. At least one of the papers bore a date subsequent to that on which appellant had left the bank. The officers asked Mrs. Chapman what the papers were, and she went through a pile, explaining them. Sergeant Lance mentioned he had seen a box of something in the car outside, and asked Mrs. Chapman what was in the box. She said "Well, why don't you bring it in and we will see." As he brought it in, one of the other officers picked up from the floor one of the papers which on its face showed it was from the People's Bank, Escrow Department, and that it bore a date subsequent to Mrs. Chapman's departure from her employment there. When appellant was asked about it and where it came from, "She answered she didn't know, or she couldn't explain it, or something of that nature."

Sergeant Lance was then satisfied he had probable cause to arrest the appellant, and did so. Gibler then stayed with Mrs. Chapman in the house for two hours, and the two police officers searched the house.

We note here that before going to question the appellant or meeting Lance, agent Gibler had obtained certain information from the bank officers.[1]

We have gone into some detail describing the events leading up to the appellant's arrest, because one of the alleged grounds of error on this appeal is the correctness of the district court's denial of the motion to suppress evidence.

■ Admittedly, up to the time that the officers, voluntarily admitted to appellant's premises, saw the documents on the floor of her home which had been taken from the bank *after* her termination of employment, they had suspicions only, and no sufficient evidence to arrest the appellant, or to obtain a warrant to search her premises. Their reception at the appellant's home, the untruths told by the daughter, the observation of what was in the fireplace and on the floor, together with appellant's inability or refusal to explain her possession of the documents reportedly missing or stolen gave the officers probable cause for appellant's arrest.

■ A search and seizure incidental to a lawful arrest, without a warrant for arrest, is lawful if there exists probable cause for the arrest. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 2d 327 (1959).

■ Appellant, in oral argument, equates the two or three steps taken by an officer to the fireplace to "a search."

---

1. "Q. What information did you obtain from the bank about Mrs. Chapman before you went over to see her?

"A. She used to work in the escrow department. That she had quit two or three times and come back, or said she was quitting and come back. Mr. Hoffman said two or three times after she had quit she called the bank after banking hours and on one occasion talked to one of the officers there. He also said he suspected that she had made other calls to the bank after their regular working hours and when someone would answer the person would hang up.

"Q. He suspected this was Mrs. Chapman?

"A. Well, yes, he did, because, as a matter of fact, on one of these calls, after they had hollered 'Hello' several times she began talking to them on the

other end, so that was why he suspected her. * * *

"Q. The only information you had from him at that time was she had been a former employee there and she had left, is that correct?

"A. And that they had trouble getting the key back to the main entrance to the bank from her.

"Q. They did get the key back?

"A. After she had been gone for, I believe, two or three weeks they finally got it back.

"Q. When was that?

"A. When was what?

"Q. When was that that they got the key back?

"A. After she terminated two or three weeks, which they told me was about March 15th." (Tr. 168–69.)

We do not. It is not a search for an officer to observe (once lawfully near or on and within premises) that which is clearly and plainly to be seen, even if he uses searchlights or field glasses. United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927).

■■ Even if the objects clearly visible in the room were deemed to be exposed to a "search" by the officers' eyes, the appellant consented to such a "search." It is clear that one may waive his rights under the Fourth Amendment and consent to a search. United States v. Page, 302 F.2d 81 (9th Cir. 1962).

We come to these conclusions entirely apart from the "exceptional circumstances" theory—the possible imminent destruction of evidence.

Our views dispose of appellant's alleged errors one and two.

The third error alleged is that the bank did not own Exhibits 2 to 6, but that Miss Hall did, and hence they could not have been taken from the bank in violation of 18 U.S.C. § 2113(c). If the jury, therefore, relied on the value of the papers, etc. in coming to its specific finding on value, the conviction was unlawful.

■ That they did not belong, and had never "belonged" to the bank, as appellant urges, is immaterial. This property, including Miss Hall's personal documents, were, while owned by her and used by her in the performance of her duties at the bank and left there when she left for the day (and even while she was there during the day), "within the care, custody or control of the bank," and thus within the statute here involved.

The two cases cited by appellant, Lubin v. United States, 313 F.2d 419 (9th Cir. 1963), and White v. United States, 66 App.D.C. 102, 85 F.2d 268 (1936), have no application here. The former involved a theft in which nothing was taken from a bank. Money was taken from a private truck, The Armored Transport of Los Angeles. We held this was a taking punishable by state law and not within § 2113(c) and (b). Armored Transport had signed a note before it received the money from the bank which money it proposed to deliver to check cashing companies. It was clear that title to the money taken had passed to Armored, and it had sole possession thereof. The money so stolen was not in the "care, custody or control" of the bank.

The second case cited held that money stolen outside the bank premises from a messenger employed by the bank was "plainly" money taken from "the care, custody and control" of the bank. This was held to violate 12 U.S.C.A. § 588b (repealed 62 Stat. 862 (1948)). It did not involve the "care, custody or control" of § 2113(c).

■ Appellant next urges that there was no proof of a "taking" in violation of 18 U.S.C. § 2113(b). Just as the money in White v. United States, supra, taken from the bank's messenger was "plainly" taken from the bank, so was the property here, though owned by an employee, "plainly" taken *by someone* from the care, custody, control and possession of the bank, after it had closed on the weekend of August 16, 1963, or on either of two previous occasions. Appellant urges there was proof only that the property had "disappeared," or was "missing." Much more proof than that existed when the evidence was found, after its disappearance, on the appellant's living room floor.

■ Appellant's next alleged error is the denial of the motion for judgment of acquittal. We hold there is clearly sufficient evidence to present a question of fact to the jury—whether the mysterious disappearance of the bank's records was caused by appellant's actions, or by that of someone else. The appellant's refusal in any way to account to the police officers for the presence of the documents in her home on August 21, 1963, as compared to her later explanation that she had, without notifying the bank, retained certain of the bank's escrow pa-

pers which allegedly "someone"[2] had mailed to her, squarely presented to the jury the question of whether appellant knew the documents were stolen from the bank. This was a factual issue properly presented for a jury's determination.

■ Appellant next urges four alleged procedural errors—

(a) That appellant was cross-examined on matters exceeding the scope of her direct examination;

(b) that the witness Hall was improperly examined on redirect;

(c) that government counsel improperly exceeded the bounds of fairness in argument; and

(d) that government counsel improperly interrupted defense counsel's argument, "and the Court joined in the interruption."[3]

These procedural matters are all plainly within and subject to the wise judicial discretion of the trial judge. The record here discloses that great patience and extreme courtesy was exercised by the eminent trial judge. We find no possible error in these charges.

■ Appellant next urges the trial judge violated Rule 30 in not advising counsel how he proposed to instruct the jury.

There is no doubt that a total omission is improper. We have not hesitated to so rule where the court has refused to advise counsel how he intends to instruct. Wright v. United States, 339 F.2d 578, No. 19290, decided December 22, 1964 (9th Cir.).

■ Counsel calls our attention to the government counsel's recital of *two* essential elements of the crime, (Tr. 425) and the court's instruction that *three* such elements existed (Tr. 488); and

requests us to compare government counsel's one paragraph recital of the law (re the inference arising from possession of recently stolen property) (Tr. 427, l.21–428, l.2) with the court's instruction, containing the precise paragraph read by the government, plus two more cautionary instructions. (Tr. 485, l.23–486, l.16.)

If anything, we think a comparison of the instructions given compared to argument aided appellant and her counsel—not the government.

■ Counsel for appellant then charges as "even worse" (a) the trial court's refusal to permit him to argue an admittedly fallacious view of the law (that a person charged with receiving stolen goods cannot be charged with stealing the same) and (b) the court's instruction that appellant's counsel could argue the facts, but not the law (Tr. 452, ll.10–11).

In Wright, supra, this court said, quoting from a sixth circuit case, " '[t]he obvious object of the rule in point [Rule 30] is to require the judge to inform the trial lawyers in a fair way what the charge is going to be, so that they may intelligently argue the case to the jury.' " (Ross v. United States, 180 F.2d 160, 165 (6th Cir. 1950).)

In the trial of this case a jury was picked on April 21, 1964. Evidence was almost completed on the 22nd.[4] Appellant had closed her defense. (Tr. 257.) After dismissing the jury for the day, the court discussed the proposed instructions. (Tr. 247.) Mr. Cantrell, defense counsel, was asked for his objections, and made one. (Tr. 247.) His objection was sustained, and his wishes followed. (Tr. 485, l.23–p. 486, l.16.) "Other than that," said Mr. Cantrell, "the

---

2. Perhaps any one of three former bank associates—Louis Hoffman, the president, Louise Hall, the new escrow clerk, or Don Lund, a fellow employee.

3. A careful examination of the record indicates that defense counsel interrupted government counsel's argument five times in opening (Tr. 426, 431, 433, 434 and 435) and once in closing, while government counsel interrupted defense counsel twice.

4. The unexpected finding of additional missing escrow files on appellant's front porch on the morning of April 22, 1964 (Ex. H) extended the trial. (Tr. 256, et seq.)

regular instructions I have no objection to." (Tr. 248, l.3.)

Three further objections then made by Mr. Cantrell were sustained, and the court twice followed his wishes. (Tr. 248–51.) It was, however, pointed out to Mr. Cantrell that he had not followed local court rules in that he had not submitted his requested instructions in a timely manner. (Tr. 249, ll.12–16.)

The next morning instructions were again considered outside the jury's hearing. (Tr. 257.) Again, counsel for appellant obtained what he requested. (Tr. 259.)

On the same day, the evidence was closed, and no reference was made to instructions. (Tr. 422.) The case was argued. It was only during argument that counsel for appellant, for the first time, claimed he did not know how the court would instruct. This arose in his argument covering the matter of value, and whether Miss Hall's property was in the care and custody of the bank at the time it disappeared. A further discussion of instructions took place. (Tr. 462–71.)

We find the facts here are in no way similar to those in the Wright case, supra. Every time counsel for appellant asked for a ruling on a proposed instruction, he obtained a ruling from the trial judge. This was done promptly and courteously, and usually resulted in action favorable to appellant. We find no violation of Rule 30 here existed. Were we to rule otherwise, we would exalt form over substance.

Finally, appellant urges as error the failure to instruct the jury on a defense theory of embezzlement. The manner of the taking of the documents from the bank is unimportant. They were taken. Appellant was not charged with taking them, but with possessing and concealing them knowing them to have been taken from the bank. Her own theory of defense (that some unknown person took them and mailed them to her) would not justify her subsequent retention and continued possession of bank records, peculiarly known to her to be escrow records from the bank for which she had previously worked, and several, at least, being records then currently needed and in use.

Finding no error, we affirm.