**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Garry Douglas HALL,
Defendant-Appellant.**

**No. 85–2722.**

United States Court of Appeals,
Tenth Circuit.

Nov. 17, 1986.

Lawrence M. Pickett, Pickett & Holmes, Las Cruces, N.M., for defendant-appellant.

David N. Williams, Asst. U.S. Atty. (William Lutz, U.S. Atty. and Robert J. Gorence, Asst. U.S. Atty., with him on the brief), Albuquerque, N.M., for plaintiff-appellee.

Before HOLLOWAY and TACHA, Circuit Judges, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

Appellant Hall appeals his conviction and sentence upon a two count indictment returned in the District of New Mexico.

Count I charged Hall with possessing, concealing, and storing money stolen from a federally insured bank, in violation of 18 U.S.C. Sec. 2113(c). Count II charged Hall with making a material false statement to the FBI concerning the description of an alleged bank robber, in violation of 18 U.S.C. Sec. 1001. The first trial to a jury resulted in mistrial because the jury was unable to reach a verdict. Upon retrial, the jury returned verdicts of guilty on both counts. Hall was sentenced to three years on Count I, and a suspended sentence and five years probation was imposed upon Count II.

On May 10, 1984, appellant Hall was working alone as the night teller at the Telshore Branch of the Western Bank in Las Cruces, New Mexico. Around 5:00 p.m. on that date a customer heard cries for help coming from the night deposit box. The police were called, the bank manager came and unlocked the banking facility, and Hall was found locked in the night depository vault. Hall told the investigators that about 4:45 p.m. he had answered a knock on the side door of the bank, believing it was a bank messenger, but when he opened the door he found a man with a pistol who told him to go on about his work at the drive-in teller's window. Hall reported that while he did so, the man removed a stethoscope-type device from his pocket, put it to the vault door, manipulated the combination lock for three to five minutes, and opened the safe. According to Hall, the robber then removed about $44,000 from the vault, filling two bank bags with the money. The alleged robber then ordered Hall into the night vault, striking him on the face when Hall hesitated. This night vault was locked by two keys which were left in the door during banking business hours. No bait money was taken from the bank vault or the tellers' drawers, and no alarm was sounded.

The first description of the bank robber which appellant gave to the F.B.I. and to Detective Marquez of the Las Cruces Police Department was that he was a white male, 5'7"–5'8" in height, light brown hair, with hazel eyes, wearing jeans, a yellow oxford shirt, a gold Rolex watch, and having a five o'clock shadow.[1] Composites made up from this description were prepared and sent out to all appropriate law enforcement agencies. It appears that Hall voluntarily took at least two polygraph tests within four days of the robbery, and that he failed these tests, or the results were inconclusive.

On May 15, 1984, Detective Marquez again questioned Hall, after informing him of the unsatisfactory results of the previous polygraph examinations. Hall, after admitting that he had given a false description of the robber because he feared for the safety of his wife, then gave a new description of the robber, stating that the man was 6' tall, with black wavy hair, a thick

---

* Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

1. This description was the subject matter of Count II of the Indictment which charged that:
"On or about the 14th day of May, 1984, at Las Cruces in the State and District of New Mexico, the defendant GARRY DOUGLAS HALL did willfully and knowingly make a false, fictitious and fraudulent statement which was material in a matter within the jurisdiction of an agency or department of the United States, to-wit: he stated to Special Agents of the Federal Bureau of Investigation that a slender person, 5 feet 7 inches to 5 feet 8 inches weighing 145 to 150 pounds had robbed the Western Bank, Telshore Branch on May 10, 1984, and the defendant did then and there know said statement was false, fictitious and fraudulent."
"In violation of 18 U.S.C. Sec. 1001."

bushy mustache, and wearing a black T-shirt with a Def Leppard or Led Zeppelin logo and a baseball cap. He repeated this story to the F.B.I. After being fully advised of his *Miranda* rights by Detective Marquez, appellant then gave a recorded statement repeating this second description. No charges were then filed against Hall, but the police officers advised the bank that they believed that defendant had lied about the circumstances of the robbery, and Hall was discharged by the bank on May 16, 1984.

After the date of the robbery, May 10, 1984, Hall never again worked alone at the bank.

On October 25, 1984, over five months after the robbery, the bank called in a repair man to work on the vault. In order to gain access for the work, a panel covering a crawl space located in the employee's bathroom was removed, and two bank bags containing $43,700 in cash were discovered in the crawl space. Hall was then indicted.

At trial an expert locksmith testified that it would take a minimum of 30 to 40 minutes for him to ascertain the combination which would open the lock in question, and that a person wearing gloves could not do so successfully within the three to five minute period described by Hall. He also testified that a stethoscopic device would not be used in the manner described by Hall. There was evidence that an F.B.I. agent, approximately the same size as Hall, could lock himself inside the night deposit vault. There was also evidence that Hall could have had access to the combination of the lock on the vault because an assistant vault teller had written it down and kept it in a drawer which was not always locked.

### The May 15th Statement

Appellant's first claim of error pertains to the admission of the tape recorded statement which he gave to Detective Marquez on May 15, 1984.

**2.** Pursuant to defendant's motion to suppress, the court also heard evidence concerning the oral statement given by Hall to the F.B.I. agents on the afternoon of May 15, 1984. Since that statement had been given prior to the time that

Prior to the first trial, Hall moved to suppress any statements which he had made to law enforcement officers on the grounds of alleged duress and coercion. At the hearing on this motion on July 19, 1985, defense counsel initially told the court that the only statement he was seeking to suppress was that given to Detective Marquez on May 15th. At this hearing, Marquez testified that Hall first changed his story about 3:30 in the afternoon, and that approximately three hours later, after he had talked with his wife and father, and after he had been fully advised of his *Miranda* rights, Hall voluntarily gave a taped and recorded statement after signing an acknowledgment that he had been advised of his rights.

After Detective Marquez testified, the parties stipulated that the May 15th Statement would not be used at trial. (Vol. II Record, p. 4)

"Mr. Kotovsky (attorney for government): Your Honor, we have stipulated that—it's our understanding we would stipulate, your Honor, that in fact the United States would not attempt to introduce this statement of Rose Marquez at the trial of this matter until the defendant has testified, and we would only use this statement for impeachment purposes in rebuttal.

"The Court: Do you understand that to be your stipulation and agreement, Mr. Pickett?

"Mr. Pickett (attorney for defendant): Yes, your Honor, Detective Marquez would not testify as to this statement nor would this statement be introduced as evidence in any fashion on the U.S. Government's case in chief. That's correct. That's the stipulation...." [2]

After the first trial resulted in a mistrial, and on August 13, 1985, the United States Attorney advised defense counsel that he would seek to introduce the Marquez statement at retrial: (Vol. VII Record, pp. 6–7).

Hall was advised of his *Miranda* rights, the motion to suppress the statement given to F.B.I. Agent Johnson on May 15th was granted. Order of July 24, 1985, Record Vol. I, Item 4.

"In a motion hearing prior to the first trial in this cause, the attorney for the government stipulated with you that he would not seek to introduce during the government's case in chief the substance of a statement given by your client to Rose Marquez of the Las Cruces Police Department.

"Based on that representation the stipulation was honored during the trial and no mention was made of the content of that statement. This is to advise that should the matter be retried, the United States will seek to introduce during its case in chief the substance of that statement. The United States will neither seek a stipulation nor enter a stipulation requiring its exclusion from evidence.

"Should you feel that this requires additional motion practice on your part, please take whatever steps you deem appropriate."

Thereafter, and on September 9, 1985, the court heard defendant's renewed motion to suppress the Marquez statement, and determined that since the statement was given after Hall was fully advised of his *Miranda* rights, it would be admitted if offered by the government.

In this appeal Hall claims that the court erroneously allowed the government to withdraw its stipulation regarding the May 15th statement, and that in any event, the tape recorded statement should have been suppressed because it was elicited as a result of coercion, threats and duress and was involuntarily given. Defendant also contends that the recorded statement was tainted by the two earlier statements given on May 15th which were obtained by unconstitutional means.

In the first instance, the stipulation entered into by the government was made only for the purposes of the trial beginning on August 5, 1985. Following the notice provided by the government, Hall had every opportunity to renew his objections to the May 15 statement given to Detective Marquez. He did not do so, waiting instead until the jury was sworn for the second trial and jeopardy had attached, before informing the court that there was

any problem about the statement. At that time, counsel for defense pressed forward as though the stipulation remained in effect, and he had had no indication to the contrary:

"Mr. Pickett: ... I am presuming that we're going by the same rules and stipulation and regulations that we had in the first trial as this one. I just want to clarify that so I am not caught by surprise because I assume that that's going to be the ruling."

The trial court quickly corrected that assumption, and further found that the statement was admissible since it was given after advice of rights. Vol. VII Record, pp. 4–10.

In the second instance it should be noted that the statement in question was not one of admission of guilt. Hall's second version of the bank robber's description and the circumstances of the robbery were in no way incriminatory of him. The testimony of Detective Marquez established that Hall made his statement freely, voluntarily, and without coercion, after having been fully advised of his *Miranda* rights. It is likewise clear that Hall's recorded statement was not fatally "tainted" because he had given similar statements to Marquez and the F.B.I. agents on that same day. The record reflects that after Hall was fully advised of his rights, he chose to give a recorded statement to Detective Marquez, and under the ruling in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), there was no error in admitting that statement.

### The Polygraph Examinations

Appellant next claims that the trial court erroneously admitted testimony that he had taken and failed two polygraph tests, and further committed error in failing to declare a mistrial because the government failed to disclose this material to the defendant. These contentions must be reviewed in their historical context because the issue first arose during the first trial. Of course, no mention of polygraph examinations was made by the government wit-

nesses in the first instance, but during cross-examination of the F.B.I. Agent Jose Jiminez during that first trial, appellant sought to impugn the quality of the investigation by showing that the F.B.I. had failed to interview other depositors who conducted business while the alleged robbery was going on—had failed to check the recovered bills for fingerprints, had failed to check financial backgrounds of other employees, etc. On re-direct examination, the government made a proffer of evidence from the agent to the effect that he knew that Hall had failed three polygraph examination, and that in his judgment it was unnecessary to conduct the type of full-scale investigation which defense counsel had intimated was necessary. At that time, the trial judge excluded this testimony, finding that its probative value was outweighed by the possibility of prejudice, under Rule 403 Fed.R.Evid. At the same time, the judge told defendant's counsel that he was concerned that the jury would not get a fair view of the government investigation as a whole:

"... you want to have your cake and you want to eat it at the same time. In other words, you want to question before the jury the quality of the examination but you don't want to permit Counsel to go into the full examination, which included the polygraph examination." (Record Vol. V p. 293)

Prior to the beginning of the second trial, the court told defense counsel that the polygraph results would be relevant if the defense again attacked the quality of the official investigation, and that he would consider admitting the polygraph evidence together with an appropriate instruction if that became necessary. Counsel was advised at that time that he "would have to buy the sour with the sweet," if he chose to pursue that course.

During cross-examination of Detective Marquez at the second trial, defendant's counsel inquired:

"Q. After May 14th (sic) when you obtained from Garry Hall a description of the 6 foot robber, what did you do with that description?"

Marquez replied that she provided that description to the F.B.I. and local authorities. On re-direct, the prosecutor asked her why she did not conduct a more thorough investigation after receiving this new information from appellant. Detective Marquez replied that she believed the information about the six foot robber was not truthful. Thereupon, outside the presence of the jury, the trial court noted that Hall had again raised an issue as to the quality of the investigation and he ultimately ruled that he would allow Marquez to testify that she did not conduct any follow-up investigation because she knew that Hall had failed polygraph examinations:

"Q. Detective Marquez, the defense attorney asked you about what you did with the description you obtained during the second interview.... And what did you do with it?

"A. I provided the information to my fellow officers and detectives.

"Q. Why did you not do more? Why did you not conduct a more complete and more thorough investigation?

"A. Because I did not feel that Mr. Hall was being truthful with me.

"Q. Why did you not feel he was being truthful?

\* \* \* \* \* \*

"A. Because Mr. Hall had been administered two polygraph tests which he had failed.

\* \* \* \* \* \*

"Q. Based on your experience, did you feel it was—anything else was appropriate, more appropriate?

"A. No, sir, I did not feel that I should further any follow up."

Following this line of questioning, the court immediately gave this limiting instruction (Report Vol. VIII pp. 277 et seq.):

"... Ladies and gentlemen of the jury, the witness has testified as to the reason why there was no follow up investigation after a certain point in time and she has referred to two polygraph examinations and the results of those polygraph examinations. Now, I'm going to instruct you

that you are not to speculate ... that you are not to take into consideration and you are not to speculate as to what those polygraph examinations or the results of those were in reference to the guilt or the innocence of the defendant in reference to whether or not he did or did not commit the acts that are charged in the indictment.

"I am only admitting that testimony to permit you to consider the witness's reasons for not following up on the investigation.

"That is, her testimony concerning the polygraphs is only admitted for the limited purpose of explaining the quality of the investigation because that was brought into the lawsuit by the defendants (sic) and it's only for that limited purpose that you may consider this testimony in reference to polygraphs...."

Some time later, at the end of the trial day, the Court gave a second limiting instruction on the Marquez testimony. (Record Vol. 8, pp. 318–319):

"Ladies and gentlemen of the jury, I am going to touch again the testimony of the witness Rose Marquez. You will recall that I permitted her to allude to the results of certain polygraph examinations. Again, I must instruct you that this testimony was admitted only for the limited purpose of explaining her stated reasons as to why the investigation of the Western Bank incident of May 10, 1984, was not continued.

"Now, that testimony, that is her allusion to these polygraph results was not admitted in relation to the issues as to whether the charges in counts 1 or 2 are true or not and you must not consider that testimony for such purposes.

"Now, in the federal courts results of polygraph examinations are not ordinarily admitted to show the existence or non-

existence of a fact in issue. Now, this is because there is unsettled controversy in the scientific and legal community as to the reliability of the results of these polygraph examinations.

"All right. With that in mind I would ask you again to please remember the Court's admonitions that I discussed with you at the beginning of the trial...." [3]

■ In this Circuit, polygraphs are not admissible to show that one is truthful, *Marks v. United States*, 260 F.2d 377, 382 (10 Cir.1958) *cert. denied*, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959); *United States v. Wainwright*, 413 F.2d 796 (10 Cir.1969) *cert. denied*, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1969); *United States v. Rodgers*, 419 F.2d 1315 (10 Cir. 1969); *United States v. Russo*, 527 F.2d 1051, 1058 (10 Cir.1975), *cert. denied*, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 831 (1976) *rehear. den.* 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204; *United States v. Hunter*, 672 F.2d 815 (10 Cir.1982). This is so because of the belief that the reliability of such tests is yet in doubt, although it has been noted that, in a proper case, the evidence might be admissible. See *Wainwright, supra*, 413 F.2d at 803.

Several Courts have permitted evidence of polygraph examination under special circumstances. In *Tyler v. United States*, 193 F.2d 24 (D.C.Cir.1951), where the defendant contended that his confession was a result of police coercion, a police officer was allowed to testify that a lie detector examination showed that defendant had been lying. Following this testimony, the trial court gave a cautionary instruction, limiting this evidence to the question of the circumstances leading to defendant's confession, and not as proof that defendant was in fact lying.[4] In finding no error, the Appellate Court stated:

---

**3.** The trial court had requested the parties to draft proposed instructions on the polygraph evidence.

At a later point in the trial, and at Hall's request, the Court again referred to the earlier Marquez instructions and advised they were to be considered as a part of the court's final charge to the jury.

**4.** The jury was instructed that " '(t)he statement of the witness that he told the defendant that the machine indicated he was lying is not admitted as evidence of any alleged lying of the defendant, but merely as evidence bearing upon the question whether the confession was, in fact, voluntary.'" 193 F.2d at 31.

"The evidence had a material bearing upon the conditions leading to Tyler's confession and was relevant upon the vital question as to whether the same was voluntary. With the court's clear and positive instruction to the jury, holding the evidence within proper bounds, and the presumption that the instruction was followed by the jury, we are not warranted in assuming that any prejudicial results followed from the incident." (193 F.2d at 31)

In *United States v. Kampiles*, 609 F.2d 1233 (7 Cir.1979) *cert. denied* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812, when defendant sought to prove that his confession was involuntary, the government sought to introduce evidence that defendant had failed a polygraph test, not as evidence of guilt, but as relevant evidence bearing upon the voluntariness of the confession. The trial court ruled that if the defense "overstepped their bounds with regard to attacking Special Agent Murphy or the manner in which the interview was conducted," he would allow evidence of the polygraph examinations to come into evidence. On appeal, the Circuit Court determined there was no error, observing that:

"It would have been unfair to allow defendant to present his account of his admissions, based upon the alleged threats by Agent Murphy, without allowing the Government to demonstrate the extent to which failure of the polygraph precipitated the confession. The bargain struck was fair because it affected both parties through prohibitions running to each side. Moreover, it left the ultimate decision to the defendant, and he deliberately chose to keep out references to both the polygraph and Agent Murphy's alleged statements....

\* \* \* \* \* \*

"This Circuit has not previously encountered the situation presented here, where polygraph evidence is offered to show the circumstances of a confession rather than its truth and is intended to rebut charges of coercion. The probative value of the evidence in sustaining the specific point for which it was being offered here is substantial, and the party offering the evidence was not asserting the accuracy of the test results. Such limited use of polygraph evidence is precisely supported by *Tyler v. United States, supra,* which is still viable. *United States v. Bad Cob,* 560 F.2d 877, 882 n. 10 (8 Cir.1977)." (609 F.2d at 1244).[5]

■ In this case, the record established that defense counsel was repeatedly warned of the possible consequences if he chose to unfairly attack the quality of the investigation of the bank robbery. Immediately following Detective Marquez' explanation of the limited scope of the investigation which followed Hall's description of the 6-foot robber, the jury was instructed on the limited nature of the polygraph evidence, and these instructions were repeated twice during the course of the trial. Juries are presumed to follow the instruction of the trial judge. *United States v. Espinosa,* 771 F.2d 1382, 1399–1400 (10 Cir.1985). Under all of the circumstances of this case, the admission of evidence concerning Detective Marquez' knowledge, as it related to her judgment on the scope of the investigation, was a matter entrusted to the sound discretion of the trial court, and that discretion was not abused.

Appellant also claims error because the government did not supply written results of the polygraph tests in a timely manner. The record reflects that prior to the first trial, and in fact *prior to the return of grand jury indictment* in this case, the defense was advised that Hall had failed three different lie detector tests, administered by three different polygraph experts, and that everyone else who had had access to the vault combination had been given a lie detector test and that all of the other employees had passed those tests. Since the government did not intend to introduce the results of those tests in its case in

---

5. In *United States v. Bad Cob, supra,* an officer testified that defendant had refused to take a lie detector test, appeared nervous, and then confessed. The court noted that evidence of defendant's refusal to take a polygraph test may be relevant in determining the voluntariness of a confession.

chief, the charts and reports were not discoverable under the provisions of Rule 16(a)(1)(D) Fed.R.Cr.Proc. (Record Vol. VII, p. 23).[6] The government was not asked to provide formal reports of the tests at any time until the afternoon of the third day of the second trial when the defense moved for a mistrial because the government had failed to disclose polygraph materials in a timely fashion. (Record Vol. IX, p. 399). The trial court ruled that there had been no violation of Rule 16. (Record Vol. IX, p. 408).

It now appears that defense counsel had seen some of the results of the examinations the day before making his mistrial motion, that he had issued a subpoena duces tecum to the Las Cruces Police Department Captain Rubio, ordering him to appear and bring with him the polygraph examination results, and that witness was present in Court, although he did not have the material immediately available. It also appears that officers of the police department had met with defense counsel during the trial and counsel had seen the results of the tests. (Record Vol. IX, p. 449).

The reference to polygraph examinations was admitted for a limited purpose—that of showing the state of mind of Detective Marquez. The trial court expressly found that the formal reports on the examinations would be of minimal relevance to that issue:

> "I'm not going to get into the exotica of the interpretation of polygraph examinations, the tests and how to interpret them or not interpret them or whether one interpretation is a proper one or what types of questions should be asked and so on.
>
> "This is a matter that experts dwell on and this is a matter that should be left to experts. I'm not going to get into that, Mr. Berman, and I don't think I have to.

"Now, I suppose if you wanted to get into it you could probably call Ms. Marquez back, but the only reason that they were admitted was as it related to her testimony based on these she had not continued the investigation. Her confidence or her interpretation of the polygraph test may have been erroneous and the confidence in the results may have been misplaced, but nonetheless it was her testimony that this was the reason she didn't go forward with it. I don't think it's of great moment as to what these things show for the limited purpose that I admitted them." (Record Vol. IX, pp. 405–406).

■ There was no Rule 16 violation with reference to the polygraph evidence. Defense counsel had full knowledge of and access to the polygraph reports, and in any event, there could be no prejudice to appellant because evidence pertaining to the administration of the tests would have been irrelevant to the issue of Detective Marquez' state of mind in her determination of the appropriate scope of her investigation into the bank robbery.

### The Statute

Appellant next claims that he was erroneously charged under the provisions of 18 U.S.C. Sec. 2113(c), which provides:

> "Whoever receives, possesses, conceals, stores, barters, sells, or disposes of, any property or money or other thing of value knowing the same to have been taken from a bank, credit union or savings and loan association, in violation of subsection (b) of this section shall be subject to the punishment provided by said subsection (b) for the taker."[7]

Section 2113(b) of Title 18 provides in pertinent part that:

> "Whoever takes and carries away, with intent to steal or purloin, any property or

6. Rule 16(a)(1)(D) provides that:
"Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports ... of scientific tests or experiments ... which are material to the preparation of the defense *or are*

*intended for use by the government as evidence in chief at the trial."*

7. The language of Section 2113(c) was modified in an immaterial manner October 12, 1984, Pub.L. 98–473, Title II, Section 1106, 98 Stat. 2145.

money or any other thing of value exceeding $1,000 .... in the care, custody, control, management, or possession of any bank ... shall be fined not more than $5,000 or imprisoned not more than ten years, or both...."

Appellant contends that violation of Sec. 2113(c) necessarily suggests a bank robbery involving force and violence, a situation not present in the instant case. He suggests that 18 U.S.C. Sec. 656 which covers embezzlement by bank employees, is a more specific and suitable criminal statute under the government's case. Section 656 provides in pertinent part that:

"Whoever, being an officer, director, agent or employee of ... any ... insured bank ... embezzles, abstracts, purloins, or willfully misapplies any of the moneys, funds or credits of such bank ... shall be fined not more than $5,000 or imprisoned not more than five years, or both...."

Hall's argument is similar to that made in *Chapman v. United States*, 346 F.2d 383, *cert. denied* 382 U.S. 909, 86 S.Ct. 249, 15 L.Ed.2d 161 (9 Cir.1965), where a bank employee was charged under Section 2113(c) for possessing bank escrow papers which had been taken from the bank while she was an employee. In finding that defendant had been properly charged under Section 2113(c), the appellate court ruled that:

"The manner of the taking of the documents from the bank is unimportant. They were taken. Appellant was not charged with taking them, but with possessing and concealing them knowing them to have been taken from the bank. Her own theory of defense (that some unknown person took them and mailed them to her) would not justify her subsequent retention and continued possession of bank records, peculiarly known to her to be escrow records from the bank for which she had previously worked, and several, at least, being records then currently needed and in use." (346 F.2d at 389).

■ Here, Hall was not charged with taking money from the Western National Bank—he was charged with receiving and concealing the money, knowing that it had been stolen from the bank. The charge under Section 2113(c) was appropriate under the factual circumstances of this case.

*Jury Instructions*

Appellant contends that he was coerced into making false statements to the law enforcement officers because he "feared great bodily harm for himself as well as his wife and that well founded fear was the only basis for giving the police a false statement." For this reason, he now contends that the trial court erroneously denied his request for jury instructions on coercion.

■ The use of a coercion defense is limited in scope—it must appear that the party was subject to an immediate threat of great bodily injury. The crime in this instance was the making of a false statement in violation of 18 U.S.C. Sec. 1001. When appellant gave his statements to law enforcement officers he was not under any threat of danger whatsoever. Because there was no evidence to support the giving of a coercion instruction, there was no error in this regard.

In instructing the jury at the first trial, the court included as an element of the crime under 18 U.S.C. Sec. 2113(c), a requirement that the acts in question be done "willfully". During the second trial, the essential elements of the crime were described as:

"First: The act or acts of receiving, possessing, concealing, storing or disposing of money taken or stolen from the Telshore Branch of the Western Bank in Las Cruces, New Mexico.

"Second, that these acts were done with the knowledge that the money which was received, possessed, concealed, stored or disposed had been taken or stolen from Western Bank.

"Third, that deposits at the Telshore Branch of Western Bank were insured by the Federal Deposit Insurance Corporation."

The court also instructed the jury on aiding and abetting to the effect that whoever willfully causes an act to be done is punishable as a principal, with the proviso that it was necessary to prove that the accused willfully associated himself in some way with the criminal venture. Record, Vol. X, pp. 620–622.

The jury was fully instructed on the definitions of "knowingly", and "willfully", and the required intent:

"The word 'knowingly' as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally, and not because of mistake or accident.

"The word 'willfully' as that term has been used from time to time in these instructions means that the act was committed voluntarily and purposely with the specific intent to do something the law forbids.

"To constitute the crimes charged in the indictment, there must be the joint operation of *two essential elements.* An act forbidden by law and intent to do the act. Before a defendant may be found guilty of a crime, the prosecution must establish beyond a reasonable doubt that under the statute described in these instructions, the defendant was forbidden to do the act charged in the indictment *and that he intentionally committed the act."* (Emphasis supplied) (Record Vol. X, pp. 624–625)

 It was not necessary for the court to instruct that "willfulness" as such was a separate, essential element of the crime charged under Sec. 2113(c). The instructions required that the receiving and concealing of stolen money be done with guilty knowledge that the money in fact had been stolen from the bank, the terms "willfully" and "knowingly" were fully defined, and in particular, a separate instruction advised the jury that the unlawful act must be intentionally committed.

*The Witnesses Thomas and Manning*

▮ Finally, appellant claims that the court erroneously allowed the witnesses Gina Thomas and Sherry Manning, two bank employees, to testify concerning Hall's admission to them that he had lied "to the authorities" about the description of the bank robber because he feared for his wife's safety. There was no objection of any kind to this testimony. As noted, Hall freely and voluntarily admitted to Detective Marquez that he had lied about the description at the time he gave his recorded statement on May 15th. In a like manner, he freely gave this same information to his co-workers. There was no error in the admission of such testimony.[8]

For the foregoing reasons, the Court is satisfied there was no error in the proceedings in the trial court. Accordingly, the Judgment is AFFIRMED.

---

**8.** The basis for appellant's contention is not clear. Prior to the first trial, appellant's statement to the FBI agents on May 15th was suppressed because *Miranda* warnings had not been given by those agents. In addition to this, the testimony of Manford Fee, the bank manager, was limited to exclude any admission Hall had made to the FBI agents on May 15th. The testimony of Thomas and Manning made no reference whatever to particular statements made by Hall to FBI agents on May 15th.