**Willie BIGFORD, Jr.,
Plaintiff-Appellant,**

v.

**Joe Max TAYLOR, Individually and as Sheriff of Galveston County, Texas, et al., Defendants-Appellees.**

No. 87-2334.

United States Court of Appeals,
Fifth Circuit.

Jan. 5, 1988.

**1214**

Beatrice Mladenka–Fowler, Nelson, Locke & Fowler, Houston, Tex., for plaintiff-appellant.

Scott Lyford, Galveston County Legal Dept., Galveston, Tex., for defendants-appellees.

Before CLARK, Chief Judge, GEE and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Galveston County sheriff's police towed and kept a young man's battered pickup truck on the suspicion that it might once have been stolen because certain identification stickers were missing or appeared to have been altered. Although the police soon decided that the truck had not been stolen, and the owner repeatedly sought return of his truck, the county justice of the peace did not order that it be returned until almost five months later. By that time, the owner had lost his job because he could not drive to work, and the storage fees amounted to almost the value of the truck. Frustrated in his every attempt to obtain relief from Galveston County, the young man sued the county, the sheriff, and the officers who had seized the truck. The district court dismissed all claims, ruling that the police had probable cause to seize the truck, the young owner had notice of the available remedies and so was not denied due process, and the county and the sheriff could not be charged for the magistrate's failure to return the truck. We affirm the holdings that the county and the sheriff may not be held liable. Because, however, the officers lacked probable cause to seize the truck originally, we reverse on this claim against one of the officers sued in his individual capacity, and we remand for the district court to determine damages.

I.

Willie Bigford, an 18 year old, had a young American's dream: a vehicle of his own. He also had energy and thrift. He worked part time after school and during holidays and saved his money. With $1,500 thus accumulated, he bought a second-hand pickup truck from his boss. The truck was beat up, rusty, and badly in need of paint, and its transmission rested precariously un-der the hood on two two-by-fours. Still, Bigford was able to drive the truck to work every day, and he planned to paint it and fix it up when he had the time and money.

While driving to work in his truck before dawn on July 13, 1982, Bigford ran out of gas on a country highway near Galveston, Texas. He walked to the nearest gas station, found it still closed, and returned to the truck to wait until the station opened. While waiting, he dozed off in the truck.

Kenneth Spoor, a Galveston County sheriff's deputy on patrol, saw Bigford's truck parked beside the road. He approached it to investigate and, seeing Bigford lying down in the cab, knocked on the window and motioned for him to step outside. When Bigford opened the door, Deputy Spoor glanced at the vehicle body facing the end of the door and noticed that the Federal Inspection Safety Sticker that was supposed to be affixed there was missing. Display of this sticker, which certifies that the vehicle meets federal safety standards, is required by federal law.[1]

Deputy Spoor had been trained to notify a supervisor when he found a vehicle whose federal safety sticker was missing. He called a Sergeant Cook, who arrived and inspected the truck further. Sgt. Cook found other suspicious signs in addition to the missing sticker. He thought that someone had tampered with the rivets on the plate, also located in the door panel, that contained the truck's vehicle identification number (VIN). He also thought that the body of the truck did not appear to match its frame, and when he looked under the hood to find the VIN, which is often stamped there, he could find no number.

Using his radio to order a computer check from a nationwide data base, Deputy Spoor learned that no theft complaint had been lodged for a vehicle with the truck's VIN or license tags. Neither Sgt. Cook nor Deputy Spoor asked Bigford if the truck was stolen or if he had proof of ownership, although Bigford had produced a valid driver's license upon Deputy Spoor's request. Had the officers asked

---

1. 15 U.S.C. § 1403 (1982).

for proof of ownership, Bigford could have produced from the truck's glove compartment a notarized title certificate, showing the transfer of the truck to him from its previous owner, his employer. He had not, however, mailed these papers to the state agency responsible for recording the transfer of title.

At no time did the officers seriously suspect Bigford of stealing or tampering with the truck, and they never arrested him or charged him with possession of a stolen vehicle. They did not telephone Bigford's employer or attempt to verify the fact that he was a local resident. Instead, and in spite of the computer report, they decided to tow the truck to a privately owned storage yard for further investigation. From previous experience, they knew or should have known that the owner of this business would charge Bigford for storage of the vehicle, whether or not the investigation ultimately determined the truck was Bigford's. When Bigford's mother arrived at the police station to pick up her son, the officers told her that they had to investigate the missing sticker and that she should call them in two days if she had not heard from them.

During the next two weeks, Bigford and his parents made a series of unsuccessful attempts to find out why the police were continuing to hold his truck. The police told the Bigfords several times that they had no new information and that the investigation would take 30 days or more. The investigation, which the district court found in fact took about two months, may be described charitably as perfunctory. The police performed a title search, which revealed a clear chain of title down to Bigford. By the time the police had completed this task, the Bigfords had searched the title themselves and obtained the same result. Without judicial authority or permission from Bigford, the police cut a hole in the floorboard of the truck in an attempt to find the VIN. Eventually, that number was discovered on the engine frame, apparently overlooked by the officers when they seized the truck. Based on these results,

the police concluded the truck was not stolen, but they said nothing to Bigford.

In the meantime, by virtue of Texas law, custody of the truck had passed almost immediately from the police to Judge James Buckner, a county justice of the peace. When Texas police seize a vehicle alleged to have been stolen, they file an inventory of its contents with a justice of the peace, who is required to hold a hearing to determine the rightful owner.[2] The district court found that Judge Buckner's office received the inventory on July 14, the day after the seizure, although it does not appear that the police ever filed a formal charge that the vehicle had been stolen. The Bigfords received no notice or citation advising them that the matter was in the hands of the justice of the peace.

Although he had received the inventory in July, Judge Buckner took no action of any kind until almost three months later. Sometime between October 13 and 21, he finally placed the matter on his docket. During the three months that the file sat on his desk, the truck sat in storage, accruing fees at something between $3 and $5 a day.

The Bigfords did not actually learn that the courts had custody of the truck until July 28, when, on a visit to the sheriff's office, they were told so by Deputy Tommy Hansen, the officer conducting the investigation. Hansen did not, however, specify which court had jurisdiction over the truck. He did advise the Bigfords to hire a lawyer. The Bigfords hired two over the next six weeks, but neither took any action. Finally the Bigfords decided to locate the right court on their own. After being directed to the wrong magistrate, the Bigfords were again set straight by Tommy Hansen, who directed them to Judge Buckner and also explained that it was up to them to petition the judge for return of the truck.

In mid-September, the Bigfords met with Judge Buckner and an assistant district attorney. The judge told the Bigfords he could not act until they petitioned for a hearing; like Hansen, he suggested they

2. Tex.Code Crim.Proc.Ann. arts. 47.01–11 (Vernon's 1979).

retain a lawyer. The Bigfords hired their third lawyer, Kent Schaffer, in October. Schaffer arranged a hearing with Judge Buckner for November 4; this was postponed to November 18.

At the "hearing," an informal meeting in Judge Buckner's office, the judge could not locate a file or any papers on Bigford's case. The assistant district attorney attending the conference, who was unfamiliar with the case, told the Bigfords they could get the truck back—if they paid towing and storage fees, which by then amounted to $700 or $800. When Schaffer replied that Bigford could not afford to pay the fees, Judge Buckner said he could do no more and that the Bigfords would have to work things out with Tommy Hansen, who, it turned out, was away on vacation until December 1. The judge declined to hold another hearing unless Hansen was present together with a representative from the district attorney's office who knew the case.

The Bigfords waited until Tommy Hansen returned, but he merely offered to return the truck if Bigford would pay the storage fees. At this point, it appears, Bigford gave up on Galveston County. He made no further requests for the truck, but instead filed this civil rights action for damages in February 1983, alleging that the county, Sheriff Taylor, and three deputies had deprived him of his truck in violation of the Fourth Amendment and without due process of law.

In March 1983, in the midst of discovery for their lawsuit, the Bigfords learned that some four months earlier, on December 2, Judge Buckner had ordered the truck returned to them. Neither the Bigfords nor their attorney had been served with notice that judgment had been entered in their favor. The Bigfords did not finally regain possession of the truck, however, until December 1985, fully three years later, after they had obtained a waiver of the storage fees. By that time, the truck had rusted badly, could not be started, and had been damaged when Hurricane Alicia struck the

Gulf Coast. It was worth about $100 in scrap value.

The course of this lawsuit is only slightly less confused than the events that occasioned it. The defendants first justified their seizure of the truck on the basis of § 49(d) of the Texas Certificate of Title Act, which authorizes impoundment of a vehicle whose driver is arrested for failure to display the required identification numbers.[3] Bigford amended his complaint to include an attack on the constitutionality of this provision. The district court upheld the statute and granted summary judgment. This court reversed and remanded in an unpublished opinion in February 1986, 784 F.2d 1111, pointing out that this section was "patently" inapplicable because the police had never arrested Bigford as the statute required.

On remand, the defendants argued that the seizure was authorized under Chapter 47 of the Texas Code of Criminal Procedure, which provides for the seizure and determination of ownership of property "alleged to have been stolen,"[4] even though it appears the police had made no formal allegation that the truck had been stolen. The district court held a bench trial and then entered judgment for the defendants based on its findings of fact and conclusions of law.

The district court ruled that the police had probable cause to seize the truck based on the missing sticker and the indications that the VIN might have been altered. Turning to Bigford's due process claim, the court first found that, because the police had probable cause to seize the truck, due process required only a post-deprivation hearing. Because the police filed an inventory with the justice of the peace within 24 to 48 hours, the court found, Bigford was accorded an adequate opportunity for a prompt hearing. The court ruled that Bigford had notice that his remedy lay with the courts and that he, therefore, had failed to make use of the remedy provided

---

3. Tex.Rev.Civ.Stat.Ann. art. 6687–1, § 49(d) (Vernon's 1977).

4. Tex.Code Crim.Proc.Ann. art. 47.01 (Vernon's 1979).

him. Finally, the court held, the failure, if any, of the justice of the peace to carry out his legal duties could not be imputed to the county or the sheriff's police.

## II.

Although Bigford has presented his contention that the seizure was without probable cause as one stitch in the fabric of his due process claim, he has also preserved his claim that the seizure violated the Fourth Amendment. His complaint casts his allegations in that form, among others, and all concerned have analyzed the case employing principles under the Fourth Amendment as well as under the Due Process Clause. Bigford's failure, therefore, to couch his argument on appeal expressly in Fourth Amendment terms does not prevent us from thus addressing it. The district court found that the police had probable cause to seize the truck because its federal safety sticker was missing and its VIN had apparently been altered, concluding that such a vehicle is likely to be stolen.

Bigford and the county here renew their debate over whether the federal safety sticker was required by state law. The answer to this question does not determine whether the police had probable cause to seize the truck. Indeed, the county admits that the issue is not whether the sticker was required but whether its absence, together with other facts, gave the police probable cause to believe the vehicle or a part of it was stolen.

■ Probable cause exists "when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed."[5] A showing of probable cause requires much less evidence than does a finding sufficient to convict.[6] Moreover, probable cause is to be determined on the basis of the facts available to the officers at the time, without reference to whether the evidence ultimately proved to be reliable.[7] In short, we are not authorized to second-guess the conduct of the police with the benefit of our knowledge, gained from later developments, that the evidence eventually turned out to be unfounded or proved insufficient to show commission of a crime. As the Supreme Court stated in *Brinegar v. United States*, when dealing with probable cause, "we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[8]

■ Nevertheless, the probable cause standard is not entirely toothless. It requires not merely a reasonable suspicion that a crime has been committed,[9] but a reasonable basis under the circumstances for reaching that conclusion and for acting on it. As a corollary, moreover, of the rule that the police may rely on the totality of facts available to them in establishing probable cause,[10] they also may not disregard facts tending to dissipate probable cause.

■ We agree with the district court that § 49(d) of the Texas Certificate of Title Act reflects a legislative judgment that alterations on an identification sticker indicate an increased likelihood that the vehicle is stolen. The purpose of that Act, as construed by Texas courts, is to stop the

---

5. *United States v. Forrest,* 620 F.2d 446, 453 (5th Cir.1980) (*citing Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)); *United States v. Ashcroft,* 607 F.2d 1167, 1170 (5th Cir.1979).

6. *United States v. Irurzun,* 631 F.2d 60, 62 (5th Cir.1980) (*quoting Ashcroft,* 607 F.2d at 1170).

7. *See, e.g., United States v. Covelli,* 738 F.2d 847, 854 (7th Cir.1984); 1 W. LaFave, *Search and Seizure* 3.2(d) at 575–76 (1987).

8. 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *see also Forrest,* 620 F.2d at 453.

9. *Cf. Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

10. *United States v. Fooladi,* 703 F.2d 180, 184

purchase and sale of stolen vehicles.[11] Considering the facts known to the police and available to them on reasonable inquiry at the place where the truck was seized, however, officers acting reasonably and prudently on the basis of all the available information, and familiar with the practical considerations of everyday life, would not have concluded that the truck had been stolen. At the time the police seized the truck, the missing sticker, the apparent alterations to the VIN on the door-jamb, and the fact that Sgt. Cook could not find the VIN on the engine block provided at most a basis for further investigation.

A reasonable police officer would have been placed on notice that further inquiry was indicated when the nationwide computer search produced no report that the vehicle matching either the VIN or the license plates on Bigford's truck had been reported stolen. Although this fact has been held insufficient to render a seizure unconstitutional when probable cause otherwise existed,[12] other authority recognizes it as an important factor militating against a finding that probable cause exists.[13]

Moreover, *State v. Lee,* the state court case that refused to hold that a computer report of "not stolen" dissipated probable cause, presented a different situation. The court there argued that the fact that the computer report indicating that the property—in that case, automobile tires—had not been stolen was "not necessarily a fact to be weighed against the others because if the theft was recent, as the snow on the tires suggested, then it would be unlikely that such a report would have been made by then."[14] In contrast, here the police could not have reasonably dismissed the negative report on the basis that the theft was recent, for as they have admitted all along, they never had any serious suspicion that the young man driving the truck had

stolen it or tampered with the identification numbers, or had any idea who had committed those acts.

Minimal further investigation, moreover, would have reduced any suspicion created by the facts the police had discovered. As Tommy Hansen, the sheriff's department's investigator, testified, it was obvious that the truck had been "just beaten around, beaten to death." It was already rusted and badly in need of paint, and from their brief investigation under the hood, the officers could have seen that the transmission was mounted inside on two-by-fours. The age and condition of this vehicle and its evident lack of value or utility should have been considered, and these facts tended to negate the reasonableness of the conclusion that a truck of such little worth had been stolen. Even apart from the computer report, then, the "suspicious circumstances" that the officers had before them were at least as consistent with the conclusion that the sticker had fallen off and the VIN plate had loosened from heavy wear and tear as they were with the conclusion that the truck had been stolen or wrongfully tampered with.

*United States v. Forrest,*[15] on which the defendants rely, is clearly distinguishable. In *Forrest,* the police seized the defendant's truck trailer as he was driving it away from his house, on the suspicion that he was using it to transport stolen eggs. The police had been watching Forrest's home because of an array of facts indicating he was involved in such a scheme. Forrest already had a reputation as a trafficker in stolen goods. He had leased several trailers to a company and had provided false VINs on the trailers in the course of that transaction. He had obtained certificates of title on several of the trailers by presenting false bills of sale to a Florida state agency. Finally, the trailer parked in

(5th Cir.1983); *United States v. Clark,* 559 F.2d 420, 424 (5th Cir.1977).

11. *Drake Ins. Co. v. King,* 606 S.W.2d 812 (Tex. 1980); *Guinn v. Lokey,* 151 Tex. 260, 249 S.W.2d 185 (Tex.1952).

12. *State v. Lee,* 302 Minn. 382, 225 N.W.2d 14 (1975).

13. *United States v. Kelly,* 547 F.2d 82, 84 (8th Cir.1977).

14. *Lee,* 225 N.W.2d at 16.

15. 620 F.2d 446 (5th Cir.1980).

Forrest's driveway, which the police eventually seized, matched closely the description of a trailer stolen in Georgia and believed to have been brought to the area where Forrest lived.

The police in *Forrest* had ample reason to believe a crime was afoot, and no information they received contradicted that belief.[16] Here, considering the contradictory set of facts available to the officers at the time, the seizure of the truck without further inquiry was unreasonable.

### III.

That the officers violated the Constitution in seizing Bigford's truck does not, of course, establish that the defendants sued here are liable to Bigford for damages even though a farcical series of blunders followed. Officer Chapa, the district court found, never took any action, but merely stood and watched while Sgt. Cook and Officer Spoor searched and impounded the truck. This finding is not clearly erroneous.

■ Nor is Sheriff Taylor liable in his individual capacity. Section 1983 does not impose vicarious or respondeat-superior liability on a police chief.[17] If, as was the case here, the sheriff is not personally involved in the acts causing the constitutional deprivation, the plaintiff must show that some other act by the sheriff caused the violation.[18] The sheriff's connection, if any, will generally be through inadequate supervision, but the plaintiff then must show that such a failure was grossly negligent and that it caused the violation.[19]

Bigford has not established either fact. Assuming it might be inferred that Sheriff Taylor had instituted a policy of seizing vehicles based on missing or altered identification stickers, Bigford has not shown that such a policy would itself be unconstitutional or that it caused the violation of his constitutional rights in this case. At most, he has shown that the officers misapplied the policy by seizing the truck without probable cause because the computer reported the truck as not stolen and because the stickers could have been damaged or destroyed through general wear and tear.

■ For similar reasons, the county is not liable for the officers' actions. The Supreme Court has ruled that a local government unit cannot be held liable under Section 1983 "unless action pursuant to official municipal [or county] policy of some nature" caused the constitutional tort of which the plaintiff complains.[20] In particular, "a municipality cannot be held liable *solely* because it employs a tortfeasor" —that is, on a respondeat superior theory.[21] A tangential relation between government policy and the alleged constitutional violation does not establish liability; the policy must be the "moving force" behind the violation.[22] In the case of a single incident of misbehavior by a municipal employee, the Court, although divided over the precise standard, has made clear that the municipality may not be held liable "merely on evidence of the wrongful actions of a single city employee not authorized to make city policy."[23]

---

16. *Id.; cf. also United States v. Duckett,* 583 F.2d 1309 (5th Cir.1978).

17. *Hinshaw v. Doffer,* 785 F.2d 1260, 1263 (5th Cir.1986) (*citing Reimer v. Smith,* 663 F.2d 1316, 1323 (5th Cir.1981)).

18. *Id.* (*citing Harvey v. Andrist,* 754 F.2d 569, 572 (5th Cir.1985); *Lozano v. Smith,* 718 F.2d 756, 768 (5th Cir.1983)).

19. *Hinshaw,* 785 F.2d at 1263; *see also Bowen v. Watkins,* 669 F.2d 979, 988–89 (5th Cir.1982).

20. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986) (*quoting Monell v. Dept. of Social Services,* 436

U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)).

21. *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036.

22. *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981); *Monell,* 436 U.S. at 694, 98 S.Ct. at 2038.

23. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2441, 85 L.Ed.2d 791 (1985) (Brennan, J., concurring in part and in the judgment).

Bigford has failed to establish the existence of a county policy or custom that was the "moving force" behind the illegal seizure of his truck. While the seizure may have taken place pursuant to a policy of impounding vehicles believed to be stolen on the basis of missing or altered stickers, Bigford has not shown that that policy was itself unconstitutional, nor has he established that anything in the policy or its administration caused the officers to apply it unconstitutionally in this case. Although Detective Tommy Hansen admitted that vehicles impounded because of suspicious circumstances frequently prove not to have been stolen or tampered with, this alone does not establish that Galveston County officers regularly seize vehicles without probable cause, for probable cause need not involve the degree of certainty necessary to establish a criminal violation. Bigford has, moreover, barely raised, let alone proven, that the illegal seizure resulted from an inadequate training or supervision program by the sheriff's office [24] or from a custom of recklessness in application of the policy of investigating vehicles.[25] Officer Spoor is the only defendant who may be held liable for the illegal seizure.

## IV.

We now turn to Bigford's claim that the defendants violated his right to due process by failing to return his truck promptly or with a sufficient hearing. We do not reach its merits, because, even assuming a constitutional violation occurred, none of those who are made defendants to this claim may be held liable.

■ Sheriff Taylor and Tommy Hansen are not liable as individuals. Once the police had sent the papers regarding Bigford's truck to the justice of the peace, responsibility for the disposition of the vehicle passed from their hands. The district court found that the police delivered the papers to Judge Buckner on July 14, one day after the seizure. This finding of fact is not clearly erroneous. Bigford points out that the case was not docketed until almost three months later, but ample evidence supports the district court's determination that Judge Buckner had received the file in July and simply had left it sitting on his desk. Bigford raises no issue concerning whether Judge Buckner lacked jurisdiction because only the inventory and no allegation that the vehicle had been stolen was filed, and we therefore intimate no opinion concerning the possible relevancy of that fact.

■ The district court, in addition, correctly concluded that the county may not bear liability for the magistrate's acts and omissions. Bigford first argues that Judge Buckner's actions themselves may be directly imputed to the county because under Texas law, justices of the peace are high policymaking officials of counties. In *Pembaur v. City of Cincinnati*, [26] the Supreme Court ruled that a county may be held liable when the county official whose policy decision the plaintiff challenges is "responsible for establishing final policy with respect to the subject matter in question." [27] Before *Pembaur*, this court had emphasized that policymaking authority under *Monell* "is more than discretion, and it is far more than the final say-so, as a matter of practice." [28] The official must have "the authority to define objectives and choose the means of achieving them," not merely the latitude to exercise discretion in pursuing objectives and employing means set by other agents—a latitude "essential even to virtually ministerial tasks." [29]

---

24. *See Tuttle*, 471 U.S. at 822–24, 105 S.Ct. at 2436 (Rehnquist, J.); *id.* at 828–33, 105 S.Ct. at 2439–41 (Brennan, J.); *Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 169–70 (5th Cir. 1985).

25. *See Grandstaff*, 767 F.2d at 170–72.

26. 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

27. *Id.* at 483–84, 106 S.Ct. at 1300.

28. *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir.1984) (en banc).

29. *Rhode v. Denson*, 776 F.2d 107, 109 (5th Cir.1985).

The county judge of a Texas county may possess such policymaking authority in some matters, as this court intimated in *Familias Unidas v. Briscoe.*[30] As the court there noted, the Texas constitution and statutes give the county judge numerous executive, administrative, and legislative chores, such as presiding over the county's legislative body, preparing the county budget, and conducting elections, with "virtually absolute sway over the particular tasks or areas of responsibility entrusted to him by state statute" and accountability to "no one other than the voters for his conduct therein."[31] The court concluded that "at least in those areas in which he, alone, is the final authority or ultimate repository of county power," the county judge was a policymaker whose official conduct and decisions could be attributed to the county under section 1983.[32]

Judge Buckner, however, was not the Galveston County Judge, but a justice of the peace for one precinct of the county. His job is to adjudicate various small claims such as the question of vehicle ownership presented here, and it does not involve any of the policymaking functions assigned to the county judge.

In *Familias Unidas,* moreover, the particular statute authorizing the judge to act also so narrowed his discretion that, with respect to the subject matter in question, he was effectuating the policy of the State of Texas, not making policy under a standardless grant of authority.[33] The responsibility of the justice of the peace in determining ownership of a vehicle alleged to have been stolen is similarly circumscribed by state law. Article 47.01a of the Texas Code of Criminal Procedure, which governs when no criminal charges are pending and under which Judge Buckner apparently proceeded in this case, provides that, after hearing held on petition of any interested person, "[t]he magistrate shall order the property delivered to whoever has the superior right to possession." While the justice of the peace clearly has de facto discretion over how the cases on the court's docket are to be handled, "policymaking authority is more than discretion, and it is far more than the final say-so, as a matter of practice."[34] Judge Buckner was charged with carrying out Texas's policy that vehicles be delivered, after a hearing, to the rightful owner. His "deliberate or mistaken departure from the controlling law" cannot be said to represent county policy.[35]

In addition to arguing that Judge Buckner denied due process by failing to convene a prompt hearing, Bigford makes a second claim: that the county should have provided him an opportunity to regain possession of his truck by posting an appearance bond. He relies on this court's decision in *Breath v. Cronvich,*[36] which upheld Louisiana's statute for towing of illegally parked vehicles in part because the statute afforded such a procedure. We regard this as, in substance, a facial attack on the constitutionality of Tex.Code Crim. Proc. arts. 47.01–11, which offer no such option to the driver of a vehicle that is alleged to have been stolen.

Bigford's challenge, construed in this light, raises the question whether implementation of a facially unconstitutional state statute, assuming this statute is so, by the county officers charged with implementing it amounts to a county "policy" under *Monell* and subsequent cases. This court has reached somewhat conflicting results on this issue. In *Familias Unidas,* the court refused to hold the county liable for the conduct of a county judge, holding that the judge's action, "like that of a county sheriff in enforcing a state law, may more fairly be characterized as the effectuation of the policy of the State of

---

**30.** 619 F.2d 391 (5th Cir.1980).

**31.** *Familias Unidas,* 619 F.2d at 404.

**32.** *Id.*

**33.** *Id.; see also Carbalan v. Vaughn,* 760 F.2d 662, 665 (5th Cir.1985).

**34.** *Bennett,* 728 F.2d at 769.

**35.** *Pembaur,* 475 U.S. at 486, 106 S.Ct. at 1302 (White, J., concurring).

**36.** 729 F.2d 1006 (5th Cir.1984).

Texas embodied in that statute, for which the citizens of a particular county should not bear singular responsibility." [37]

In *Crane v. State of Texas*, [38] however, the court held the county liable when its District Attorney instituted a practice of issuing misdemeanor capiases without a neutral magistrate's finding of probable cause. The court distinguished *Familias Unidas* on two grounds. First, in *Familias Unidas* the defendants had complied with the state statute and should not have faced liability merely because that statute was eventually declared unconstitutional. Second, the judge in *Familias Unidas* was not, under state law, vested with the amount of policymaking discretion that the district attorney had concerning county law enforcement procedures.[39]

*Familias Unidas*, rather than *Crane*, controls here. Bigford challenges the failure to provide him the option of posting a bond. Although the magistrate may have breached his state-law duty in failing to set a hearing, he did not violate state law in failing to offer Bigford the bond procedure, for arts. 47.01–11 themselves authorize no such procedure. As already noted, moreover, the magistrate is not a county policymaker concerning the matter in question, but is carrying out the policy of the State of Texas.

Finally, although Bigford presented some evidence that Sheriff Taylor was aware of the delay in returning the truck and did nothing to resolve it, the sheriff was not the county's policymaker as to such judicial matters, as opposed to law enforcement matters. There is no evidence that the county's governing body or other high officials approved or were even aware of the magistrate's failure to act.[40]

Because Bigford has failed to establish that the county may be held liable for the delay in resolving the matter and returning the truck, and the other defendants cannot be charged for the magistrate's failures, Bigford may not recover damages on his due process claim. We therefore do not consider whether Bigford was denied due process or whether he had adequate notice of the remedies available to him and simply failed to use them.

## V.

Because the police violated Bigford's constitutional rights by seizing his truck without probable cause, we remand to the district court to determine the damages to be assessed against Deputy Spoor, the only defendant liable under Section 1983.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED. Deputy Spoor is to pay Bigford's costs, while Bigford is to pay the other defendants' costs.

---

**37.** 619 F.2d at 404.

**38.** 759 F.2d 412 (5th Cir.1985).

**39.** *Crane,* 759 F.2d at 430 n. 19.

**40.** *See Carbalan,* 760 F.2d at 664.