# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 3, 2009

Charles R. Fulbruge III
Clerk

No. 08-30334

GLORIA BARFIELD,

Plaintiff–Appellant,

v.

STATE OF LOUISIANA, on behalf of Louisiana Department of Justice;
CHARLES C. FOTI, JR.; KRISTEN WIDMER,

Defendants–Appellees.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:05-CV-2218

Before GARWOOD, OWEN, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Gloria Barfield appeals the district court's grant of summary judgment to Kristen Widmer and the Louisiana Attorney General's Office in her § 1983 suit claiming that Widmer violated her Fourth Amendment right to be free from unlawful or illegal arrest. Because Widmer's reasonable investigation of Barfield established probable cause to arrest her, Widmer is entitled to qualified immunity. Therefore, we affirm the district court's grant of summary judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**I**

Gloria Barfield served as the Chief Executive Officer of the G.B. Cooley Intermediate Care Facility for the Mentally Retarded (Cooley) in West Monroe, Louisiana from 2003 to 2004. In September 2003, "J.W.," a fifteen-year resident of the facility who suffered from severe retardation, schizophrenia, and a seizure disorder, was transferred from the Cooley main campus to an off-campus community home in a less restrictive environment. At the community home, J.W. attempted suicide, attempted to jump from a moving van, stabbed himself in the abdomen with a knife and fork, broke windows, and broke into a neighbor's home causing the neighbor to draw a gun on him.

As a result of these incidents, the Cooley staff held several meetings from October 2003 through January 2004 discussing whether J.W. should be moved back to the Cooley main campus or whether he should stay at the community home. At these meetings, the staff, including Barfield, discussed the problems J.W. was having adjusting to the new environment and his need for one-on-one supervision if he remained in the community home. The staff ultimately decided to leave J.W. in the community home with one-on-one supervision. However, J.W. never received this supervision, his problems continued, and he was finally moved back to the main campus in January 2004.

In September 2004, the Louisiana Department of Health and Hospitals (LDHH) conducted a survey of Cooley to determine if it was in compliance with federal and state standards. Though J.W.'s care was not the sole focus of the survey, at the survey's completion, the LDHH determined that Cooley failed to meet one of the Louisiana Medicaid Program's conditions of participation, "Client Protections," by placing J.W. in an unsafe environment, not providing sufficient staff, and not taking corrective action in a timely manner. The LDHH also provided its report to the Louisiana Medicaid Fraud Control Unit (MFCU) of the Louisiana Department of Justice, who assigned Widmer, a special agent,

to investigate the possible abuse and/or neglect of J.W. Widmer did not know or have any connection with Barfield at the time.

As part of her investigation, Widmer: (1) reviewed the LDHH survey; (2) reviewed J.W.'s medical records and other records provided by Barfield and Cooley; (3) interviewed witnesses, including Cooley employees; (4) reviewed her findings with her supervisors—two assistant attorneys general who are experienced prosecutors; (5) prepared arrest and search warrants; and (6) presented the warrants to Louisiana District Judge Carl Sharp, who signed them after reviewing Widmer's arrest affidavit.

In all, six Cooley employees, including Barfield, were arrested as a result of Widmer's investigation. Barfield was charged with cruelty to the infirm under Louisiana Revised Statutes § 14:93.3. The Ouachita Parish District Attorney's Office later declined to pursue the charges against Barfield after conducting its own investigation.

In November 2005, Barfield filed this action under 42 U.S.C. § 1983 in a Louisiana state court, alleging that Widmer had violated her constitutional rights by intentionally filing a frivolous arrest affidavit and that the Attorney General was vicariously liable for Widmer's actions. After removing the case to federal court, the defendants moved for summary judgment, asserting the defense of qualified immunity. The district court granted their motion, which Barfield now appeals.

## II

This court reviews a district court's grant of a motion for summary judgment on the basis of qualified immunity in a § 1983 suit de novo.[1] Although nominally an affirmative defense, the plaintiff has the burden to negate the

---

[1] *Freeman v. Gore*, 483 F.3d 404, 410 (5th Cir. 2007).

assertion of qualified immunity once properly raised.[2]  Claims of qualified immunity require a two-step analysis.[3]  First, we generally determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights.[4]  Only if such a violation occurred do we proceed to the second step, which is to determine whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.[5]  "To make this determination, the court applies an objective standard based on the viewpoint of a reasonable official in light of the information then available to the defendant and the law that was clearly established at the time of the defendant's actions."[6] Accordingly, we first determine whether Widmer violated Barfield's constitutional rights.

Barfield argues that Widmer violated her Fourth Amendment rights by causing her to be arrested without probable cause and by failing to uncover readily available exculpatory evidence in her investigation.  Probable cause exists when the facts and circumstances within an officer's personal knowledge are "sufficient to occasion a person of reasonable prudence to believe an offense has been committed."[7]  "Moreover, probable cause is to be determined on the basis of the facts available to the officers at the time, without reference to whether the evidence ultimately proved to be reliable."[8]  An officer who

---

[2]  *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

[3] *Freeman*, 483 F.3d at 410.

[4]  *Id.*

[5] *Id.* at 411.

[6] *Id.*

[7] *Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988).

[8] *Id.*

"reasonably but mistakenly conclude[s] that probable cause is present" is still entitled to qualified immunity.[9]

Because Widmer performed a reasonable investigation and uncovered enough facts to reasonably believe Barfield violated Louisiana Revised Statutes § 14:93.3, we agree with the district court that Widmer had probable cause to seek a warrant for Barfield's arrest for cruelty to the infirmed. Section 14:93.3 defines "cruelty to the infirmed" as "the intentional or criminally negligent mistreatment or neglect by any person, including a caregiver, whereby unjustifiable pain, malnourishment, or suffering is caused to the infirmed, a disabled adult, or an aged person, including but not limited to a person who is a resident of a . . . mental retardation facility."[10] Widmer's investigation revealed that Barfield knew about J.W.'s violent incidents and the trouble he was having adjusting to the new environment. The investigation also revealed that Barfield refused to move him back to the main campus and failed to ensure that he received one-on-one supervision, both of which were steps recommended by J.W.'s care team. As a result, J.W. experienced more violent incidents that resulted in harm to himself. These facts, which Widmer documented in her arrest affidavit, provide enough basis for a "person of reasonable prudence" to believe that Barfield violated § 14:93.3.

Barfield contends, however, that Widmer lacked probable cause because documents she reviewed in her investigation contained evidence indicating that Barfield was innocent. First, Barfield argues that two memoranda from Florence Fields, a Qualified Mental Retardation Professional working with J.W., showed that Barfield was led to believe that J.W. was receiving one-on-one supervision. Barfield contends that she could not have been criminally negligent

---

[9] *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

[10] LA. REV. STAT. ANN. § 14:93.3 (2008).

if she reasonably believed that J.W. was receiving the supervision that he needed. However, neither of these memos undermine the reasonableness of Widmer's probable cause determination.

The first memo from Fields related to a meeting on October 8, 2003 in which the Cooley staff discussed J.W.'s situation and whether he should be moved back to the main campus. According to the memo, Barfield said that J.W. should remain at the community home, but initially suggested giving him one-on-one care. The somewhat ambiguous memo then states that Barfield later changed her mind:

> But by the end of the day, there was not to be an [sic] one to one we cannot afford one we were told. Mrs. Barfield change [sic] her mind due to the Program managers present assured her they had it taken care of one Program Manager offered a staff to assist the other program Manager, but that never occurred. [sic]

This memo alone does not clearly exculpate Barfield or defeat Widmer's probable cause determination. Though it suggests that Barfield was told that a staff member "had it taken care of," the memo states that it never actually occurred.

The second memo discusses a meeting held on November 25, 2003 after J.W. experienced more violent incidents. The memo indicates that Barfield declined to approve a one-on-one personnel assignment for J.W. without approval from accounting. A handwritten addition to the note states that "[t]here was a meeting held to discuss the problem w/ [J.W.] at the time the program managers stated they would provide support. Therefore, CEO assume it was aright [sic]." Barfield points to this addition as showing that, again, Barfield was told that J.W. was being taken care of appropriately. However, the handwritten note is ambiguous as to exactly what Barfield knew. It is unclear whether the note is referring to what Barfield was told at the October 8 meeting or the November 25 meeting, since the note appears to be referring to a different

meeting from the one that is the subject of the memo. Either way, this ambiguous statement is not enough to defeat Widmer's probable cause determination, given the other evidence Widmer considered.

In addition to the two memos from Fields, Barfield points to the minutes from two management meetings from November 25, 2003 and December 2, 2003 that she claims prove that she was not negligent because she was told that J.W. was receiving the appropriate care. The November 25 meeting minutes stated that "[s]everal staff agreed that there is a need [for one-on-one staffing] and that one staff [sic] is working with J.W." The December 2 meeting minutes stated that "Ida acknowledged that J.W. requires constant care, which he does have now." Though the minutes from these meetings suggest that Barfield was told that J.W. was receiving adequate care, there is no showing in the record that Widmer had seen or knew about these minutes. Thus, these minutes do not undermine the reasonableness of Widmer's probable cause determination based on the evidence uncovered in her investigation.

Barfield also argues that Widmer should have known, based on Cooley's transfer policy, that the admissions team, not Barfield, transferred J.W. to the community home. The transfer policy states that, for a decision to discharge or transfer a client, an interdisciplinary team would conference to develop a recommendation as to whether the client should be discharged or transferred. The "admission, transfer, discharge committee" would then decide whether to approve that decision. Widmer's investigation, which included interviews with individuals closely involved in J.W.'s care, indicated that, contrary to Cooley's policies, Barfield held the ultimate power to approve J.W.'s transfer back to the main campus but refused to do so. Widmer was reasonable in relying on this information and the existence of the transfer policy does not undermine the probable cause determination.

Finally, Barfield argues that Widmer's failure to uncover exculpatory evidence that was readily available to her violated Barfield's constitutional rights. Barfield cites two cases, *Evett v. Deep East Texas Regional Narcotics Trafficking Task Force*[11] and *Vance v. Nunnery*,[12] arguing that an investigating officer must obtain readily available exculpatory evidence and provide it in her arrest affidavit. Barfield asserts that Widmer failed to interview more than five individuals in her investigation and should have interviewed a majority of the members of J.W.'s admissions team—who would have revealed that decisions relating to J.W. were made by a team of professionals rather than just Barfield.

However, *Evett* and *Vance* do not require that an officer perform a perfect investigation that uncovers all readily available exculpatory evidence. Rather, they stand for the basic premise that an officer must have probable cause to make an arrest based on an investigation that was reasonable under the circumstances.[13] Widmer had probable cause to seek a warrant for Barfield's arrest based on her reasonable investigation. Widmer did not know Barfield prior to the investigation and there is no indication that she bore any malice towards Barfield. In her investigation, she reviewed the LDHH survey and its supporting documentation as well as documentation about J.W. and Cooley's policies and procedures. She also interviewed a number of witnesses, including J.W.'s aunt, current and former employees of Cooley, J.W.'s psychological associate, and one of J.W.'s Qualified Mental Retardation Professionals. After completing her investigation, Widmer reviewed her findings with two

---

[11] 330 F.3d 681 (5th Cir. 2003).

[12] 137 F.3d 270 (5th Cir. 1998).

[13] *See Vance*, 137 F.3d at 276-77 (holding that an officer lacked probable cause to arrest a suspect for a burglary that he had no evidence actually occurred and that a reasonable officer would have continued his investigation); *Evett*, 330 F.3d at 689 (holding that an officer lacked probable cause when he based the arrest on a "feeling" formed after receiving information from an "unsubstantiated source").

experienced assistant attorneys general before preparing the arrest and search warrant affidavits that were presented to Judge Sharp. These steps were reasonable under the circumstances.

\* \* \*

We AFFIRM the district court's grant of summary judgment.